**UNITED STATES OF AMERICA**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

GHAISAA AFIOUNI,

       Plaintiff,

v.

ARAB COMMUNITY CENTER
FOR ECONOMIC AND SOCIAL
SERVICES (ACCESS),

       Defendant.

_____/

Case No. 22-cv-12365

Hon. Jonathan J.C. Grey

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND DENYING ITS REQUEST FOR SANCTIONS
(ECF No. 50)**

## I.    INTRODUCTION

Plaintiff Ghaisaa Afiouni worked at Defendant Arab Community
Center for Economic and Social Services (ACCESS) for over 19 years until
her termination in 2021. Afiouni alleges that ACCESS discriminated
against her due to her religion in violation of state and federal law.[1]
Specifically, Afiouni contends that ACCESS failed to give her raises and

---

[1] Afiouni's complaint also included sexual harassment, retaliation claims, and
harassment allegations. (ECF No. 1, PageID.15) ACCESS moved to dismiss those
claims. (ECF No. 8.) The Court granted the motion to dismiss those claims. (ECF No.
15, PageID.273–274, 279.)

promotions, and ultimately terminated her because she is a non-observant, Sunni Muslim. Afiouni also alleges that ACCESS had a practice of giving observant Muslim employees paid time off for religious observances. Afiouni asserts that ACCESS failed to give non-observant employees paid time off for religious observances.

Discovery has closed, and ACCESS has moved for summary judgment on the failure to give a raise, failure to promote, and termination claims. (ECF No. 50.) Since Afiouni has not produced any evidence to establish a prima facie case, she cannot demonstrate that a genuine issue of material fact remains for trial on these three claims. The Court **GRANTS** the motion for summary judgment, and only Afiouni's claim about discriminatory paid time off benefits remains.

ACCESS also requests sanctions in its motion for summary judgment. Since ACCESS failed to offer any evidentiary or legal support to justify its request, the request for sanctions is **DENIED**.

## II.   BACKGROUND

ACCESS is a non-profit organization providing social, medical, job training and other services to Arabs, Arab-Americans, refugees, United States citizens, and Michigan residents. (ECF No. 50-2, PageID.713–

716.) Afiouni began working at ACCESS on March 20, 2002, initially in a part-time position. (ECF No. 50-3, PageID.816; ECF No. 50-5, PageID.1369–1370.) On August 5, 2002, she became a full-time case manager, managing a program in ACCESS's Employment and Training Department. (ECF No. 50-5, PageID.1369; ECF No. 50-3, PageID.817.) Around 2004 or 2005, Afiouni received a promotion to coordinator. (ECF No. 50-3, PageID.816–817; ECF No. 50-2, PageID.720; ECF No. 50-5, PageID.1370.) In May 2020, ACCESS changed Afiouni's title to supervisor of the Employment and Training Department, and she signed a document acknowledging the change in job description. (ECF No. 50-2, PageID.720.) At the same time, Afiouni received a $5,000 raise. (ECF No. 50-5, PageID.1374; ECF No. 50-3, PageID.933.) Afiouni worked at ACCESS for over 19 years and remained a supervisor until her termination on February 23, 2021. (ECF No. 50-4, PageID.1119; ECF No. 50-5, PageID.1370.)

ACCESS's employees span various religious and non-religious backgrounds. (ECF No. 50-2, PageID.716–717.) While it does not track the religion of its employees, ACCESS has a substantial number of

3

employees who are Sunni and Shi'ite Muslims and Protestant, Catholic, and Orthodox Christians. (ECF No. 50-2, PageID.716.)

In her complaint, Afiouni identified herself as a non-observant, Sunni Muslim.[2] (ECF No. 1, PageID.13.) She alleges that her status as a non-observant, Sunni Muslim formed the basis of her religious discrimination claims, including denial of job promotions, salary raises, and benefits, and ultimately, her termination. (ECF No. 1, PageID.4, 7, 13.)

### A.   Afiouni alleges that she did not receive raises or promotions because of her protected status.

According to Afiouni, her salary hovered around $40,000-48,000 throughout her 19-year career at ACCESS. (ECF No. 50-4, PageID.1119, 1220.) Afiouni alleges that ACCESS did not give her an additional raise due to her identity—a Sunni (instead of Shi'ite), non-observant Muslim employee. (ECF No. 1, PageID.4, 13; ECF No. 50-3, PageID.873.) Afiouni identifies Rashid Amin, a Shi'ite Muslim, and Alma Koprencka, a non-observant, Sunni Muslim, as similarly situated employees who each

---

[2] In a deposition, Afiouni declined to identify her religion but testified that she came from a Sunni Muslim family. (ECF No. 50-3, PageID.821.) The Court accepts the statement in Afiouni's complaint at this stage of the case.

received raises around 2016. (ECF No. 50-3, PageID.870, 872–874; ECF No. 50-8, PageID.1537.)

Afiouni alleges that she was denied promotions because she was a Sunni Muslim. (ECF No. 1, PageID.4.) To contend for a promotion, ACCESS employees had to apply for posted positions. (ECF No. 50-3, PageID.874–875; ECF No. 50-4, PageID.1122; ECF No. 50-5, PageID.1373–1374.) Afiouni recalls applying and interviewing for at least one promotion in her nearly two-decade career. (ECF No. 50-4, PageID.1117–1121.) Afiouni contends that ACCESS failed to promote her but remains unsure of whether ACCESS hired any new individual or whether ACCESS filled the position to which she applied.[3] (ECF No. 50-4, PageID.1119–1120.) Afiouni alleges generally that ACCESS frequently promoted Shi'ite Muslim employees less qualified than her.[4] (ECF No. 1, PageID.4; ECF No. 50-4, PageID.1119–1121.)

---

[3] Neither party identified the position title, date of hiring, or the background of the person hired for the role. (ECF Nos. 50; 57.)

[4] She does not identify in her response which employees were less qualified and promoted or given raises, nor the years such decisions were made. (ECF No. 57.)

5

## B. ACCESS staffs' alleged discriminatory remarks.

Afiouni contends that ACCESS staff constantly criticized her for not fasting and dressing like observant Muslims. (ECF No. 57-4, PageID.1699–1706; ECF No. 57-5, PageID.1709, 1711–1717.) Afiouni has forgotten the exact statements and timelines for the remarks, but she recalls one person in particular who criticized her: Najwa Hadous, a Shia Muslim and the Director of the Employment and Training Department, who worked at ACCESS until her retirement in July 2021. (ECF No. 50-5, PageID.1376, 1376; ECF No. 50-3, PageID.820–828.) According to Afiouni, Hadous told her that she did not dress "the way Muslims dress" nor observe the mourning practice where Shia Muslims annually "wear black for ten days mourning the [Prophet] Hussain." (ECF No. 50-3, PageID.823–824.) The remarks about the mourning period occurred annually. (ECF No. 50-3, PageID.826.) Afiouni preferred to dress in colors such as red, blue, or green at work. (ECF No. 50-3, PageID.823.) Afiouni alleges that Hadous told several individuals that Afiouni dressed too "sexy." (ECF No. 50-3, PageID.829.)

In addition to Hadous' remarks, Afiouni asserts that Lina Hourani-Harajli, ACCESS's Chief Operating Officer and a Sunni Muslim, told

6

Afiouni that she had a "preference" for Shia Muslims.[5] (ECF No. 50-2, PageID.725; ECF No. 50-4, PageID.1125–1126.) Afiouni does not recall the context or the date when Hourani-Harajli made the statement. (ECF No. 50-4, PageID.1125–1126.)

### C. Afiouni alleges that ACCESS had a discriminatory paid time off policy or practice.

According to Afiouni, ACCESS had a policy or practice of giving observant fasting Muslims paid time off for religious observance, such as Ramadan, and denying non-observant Muslims paid time off. (ECF No. 50-4, PageID.1130–1132.) During her time at ACCESS, she did not fast for religious observances. Afiouni contends that Hadous said upper management had decided that Afiouni did not qualify for the paid time off because she did not fast for Ramadan. (ECF No. 50-4, PageID.1138–1139.)

### D. Afiouni alleges ACCESS employees spied on her at work.

Afiouni also alleges that ACCESS asked several employees to discriminatorily spy on her during the workday. (ECF No. 1, PageID.8.)

---

[5] Hourani-Harajli's declaration does not mention whether she is an observant Muslim. (ECF No. 50-2, PageID.725.)

Former ACCESS employee Mariam Chamesseddine stated that during her interview for an ACCESS position, she was asked by someone to "be a spy" on her prospective supervisor before or around 2014, but she declined the request.[6] (ECF No. 57-1, PageID.1681.) At some point during her nearly five-year career, ACCESS's Deputy Director of the Employment and Training Department, Julio Jamal,[7] asked Chamesseddine if Afiouni said "Hello" to the CEO and HR manager. (*Id*.) Chamesseddine also stated that she observed co-worker Alicia Truccone "eavesdropping" on Chamesseddine and Afiouni several times. (*Id*.) Chamesseddine resigned on September 16, 2019. (*Id.)*

### E.     ACCESS reclassifies Afiouni's job title and ultimately terminates Afiouni.

In May 2020, ACCESS reclassified Afiouni's position and she signed an ACCESS job description form for "Supervisor, Employment, and Training" which stated that some of her duties included "oversee[ing] the daily operation of the program and ensur[ing] all requirements are met" and "review[ing] files and documents of all services provided in compliance with the agencies and funding source quality assurance

---

[6] Chamesseddine's declaration does not mention her religious affiliation. (ECF No. 57-1.)

[7] Jamal's declaration does not mention his religious affiliation. (ECF No. 50-7.)

8

plan[.]" (ECF No. 50-2, PageID.805.) She oversaw the Advance Michigan Catalyst program and two ACCESS case workers, including Truccone, who worked on the program. (ECF No. 50-3, PageID.819, 964–965; ECF No. 50-2, PageID.799.)

The Advance Michigan Catalyst program is supported by an America's Promise grant funded by the U.S. Department of Labor's Employment and Training Administration through its contract with the Southeastern Michigan Community Alliance (SEMCA) and is designed to provide unemployed, underemployed, and incumbent workers with Robotics, Automation, and Advanced Manufacturing training to meet the industry needs. (ECF No. 50-2, PageID.799–800.) SEMCA entered into an agreement with ACCESS for ACCESS to administer the Catalyst program grants. (ECF No. 50-2, PageID.717–718.) In a December 23, 2019 memorandum, SEMCA advised ACCESS of the Catalyst program requirements that governed the administration of the grants. (ECF No. 50-2, PageID.718, 799.) Eligible participants must:

1. Be a citizen of the United States or an eligible non-citizen;

2. Be 16 years of age or older;

3. Not be currently enrolled in a school within a local educational agency; and

4. Be registered with selective service (if applicable).

(ECF No. 50-2, PageID.799.) SEMCA required ACCESS to identify, test, and screen applicants for Catalyst-funded training programs to ensure they met the forementioned criteria and submit a Catalyst File Verification Checklist confirming that the applicant met the requirements and reviewing the applicant's supporting documentation to SEMCA. (ECF No. 50-2, PageID.718, 800–801.) ACCESS required Catalyst program applicants to provide documents, including birth certificates, passports, and a resume, to establish that they satisfied the four eligibility requirements. (ECF No. 50-2, PageID.719.) Next, ACCESS case workers reviewed the applicant's documentation, and if it was satisfactory, signed a "Catalyst File Verification Checklist" verifying that the applicant had provided the supporting documentation that established his or her eligibility for the Catalyst grant. (ECF No. 50-2, PageID.719, 803.) Finally, ACCESS managers would then review the documentation, and if it was satisfactory, sign the "Catalyst File Verification Checklist" on the line above the words, "Manager Checking

Documentation" before the materials were submitted to SEMCA. (ECF No. 50-2, PageID.719, 803; ECF No. 50-3, PageID.965.)

In June and July 2020, ACCESS signed up four students for the Catalyst program who were not eligible because they were enrolled in public schools and did not meet the third requirement. (ECF No. 50-2, PageID.809; ECF No. 50-6, PageID.1449–1459, 1471–1472, 1489–1490, 1507–1508.) On each of the student's Catalyst File Verification Checklist, Truccone signed as the "Staff" completing the checklist and Afiouni appeared to have signed as the "Manager Checking the Documentation." (ECF No. 50-6, PageID.1449–1459, 1471–1472, 1489–1490, 1507–1508.) Each of the applicants' supporting documentation included resumes that indicated they were enrolled in high school. (ECF No. 50-6, PageID.1455, 1477, 1495, 1513.) SEMCA approved the disbursement of $20,619.40 in federal funds to cover students' training based on the verifications submitted by ACCESS. (ECF No. 50-2, PageID.809.)

On December 23, 2020, SEMCA sent ACCESS's former President and CEO Hassan Jaber, a Sunni Muslim, a letter stating that it conducted an audit and found that ACCESS wrongly certified four applicants as eligible for the program even though they were not,

11

resulting in the improper disbursement of $20,619.40. (ECF No. 50-2, PageID.809.) SEMCA required ACCESS to submit a written plan for corrective action within 30 days of the letter. (ECF No. 50-2, PageID.810.)

After learning of the incident, Hadous and Jamal investigated the matter, interviewed Afiouni and Truccone, and reported their findings and documentation to ACCESS's Human Resources Manager Mosein Hussein, an observant, Sunni Muslim. (ECF No. 50-5, PageID.1370, 76, 1380.) Afiouni disputes that she met with anyone to discuss the allegations. (ECF No. 50-3, PageID.1049–1050.)

Hussein met with Jamal and Hadous and recommended that ACCESS terminate both Truccone and Afiouni for grossly negligent conduct. (ECF No. 50-5, PageID.1377.) Hussein stated that the documentation submitted by the students indicated that they were ineligible. (ECF No. 50-5, PageID.1378.) Hussein found termination appropriate because the errors resulted in the wrongful expenditure of federal funds, and such errors could jeopardize ACCESS' ability to obtain future contracts with SEMCA and other agencies. (ECF No. 50-5, PageID.1378.)

On February 23, 2021, Hussein, Hadous, and Jamal met with Afiouni and Truccone. (ECF No. 50-5, PageID.1379; ECF No. 50-4, PageID.1199-1200.) According to Hussein, in the meeting with Afiouni, Afiouni admitted to signing the checklist for all of the students. (ECF No. 50-5, PageID.1379.) Afiouni disputes this and states that her signature was "cut and pasted" and alleges that Truccone never sent the documents to Afiouni to review. (ECF No. 57, PageID. 1650, 1657, 1659.) At the end of the call, Jamal informed Afiouni that ACCESS was terminating her; and ultimately, sent a letter confirming her termination. (ECF No. 50-5, PageID.1379.) On the same day, the trio met with Truccone and terminated her.[8] (ECF No. 50-5, PageID.1380.)

### F. Afiouni post-termination actions.

After her termination, Afiouni sought unemployment compensation. (ECF No. 57-2, PageID.1687.) Michigan's Unemployment Insurance Agency (UIA) denied her unemployment claim, finding that she was disqualified under the misconduct provisions of Section 29(1)(b) of the Michigan Employment Security Act (the "Act"). (*Id.*) On June 6, 2021, Afiouni appealed her unemployment claim to the Licensing and

---

[8] Truccone comes from a Catholic family. (ECF No. 50-9, PageID.1555.)

Regulatory Affairs agency.  (ECF No. 57-2, PageID.1685.) After a three-day hearing, an administrative judge, Judge Marie L. Wolfe, reversed UIA's determination and found that Afiouni was not disqualified from receiving unemployment compensation because of her termination. (ECF No. 57-2, PageID.1687-1690.) The administrative judge determined that Afiouni's poor work performance, which ACCESS had alleged, did not equate to "misconduct" under the Act. (ECF No. 57-2, PageID.1688–1690.)

On October 4, 2022, Afiouni filed the instant complaint. (ECF No. 1.)

## III.   LEGAL STANDARD

The Federal Rules of Civil Procedure provide that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The presence of factual disputes will preclude summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Id.* The Court views the record in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004).

Although the Court gives the non-moving party "the benefit of all reasonable factual inferences, she still must counter [the defendant's] initial showing by identifying significant probative evidence on which the jury could reasonably find for her." *Bivens v. Zep, Inc.*, 147 F.4th 635, 642 (6th Cir. 2025). "Put differently, summary judgment [is] proper if [Afiouni] fail[s] to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] [bore] the burden of proof at trial." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)) (some brackets in the original) (internal quotations removed).

## IV. ANALYSIS

ACCESS moves for summary judgment on Afiouni's Title VII and state religious discrimination pay raise, promotion, and termination claims, arguing that Afiouni has no evidence that it discriminated against her based on religion. (ECF No. 50, PageID.703-705.) Afiouni responds that ACCESS is collaterally estopped from relitigating the facts surrounding her termination before addressing the merits. (ECF No. 57,

PageID.1664-1669.) The Court first addresses Afiouni's collateral estoppel argument before turning to the merits of her religious discrimination claims.

## A. Collateral Estoppel

Afiouni argues that collateral estoppel blocks ACCESS from asserting a defense that it terminated Afiouni for misconduct, because this claim has already been litigated in a state administrative proceeding. (ECF No. 57, PageID.1664-1669, 1678.) According to Afiouni, collateral estoppel applies because Michigan Licensing and Regulatory Affairs' (LARA) Administrative Law Judge Marie L. Wolfe issued an order addressing her Unemployment Insurance Agency ("UIA") appeal and found that Afiouni did not commit misconduct as defined under Section 29(1)(b) of the Act. (ECF No. 57, PageID.1665.) After a three-day hearing, Judge Wolfe reversed the UIA's determination and found that Afiouni was entitled to unemployment compensation under the Act. (ECF No. 57-2, PageID. 1687-1690.)

The Court first considers whether collateral estoppel prevents the litigation of facts as to Afiouni's Title VII termination claim and finds that it does not. "[C]ollateral estoppel [ ] bars subsequent re-litigation of

16

a fact or issue where that fact or issue was necessarily adjudicated in a prior cause of action and the same fact or issue is presented in a subsequent suit." *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 589 (6th Cir. 2009) (citations omitted). The United States Supreme Court has held that Title VII claims cannot be collaterally estopped or precluded by unreviewed state administrative proceedings. *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 827 (6th Cir. 2013); *University of Tennessee v. Elliott*, 478 U.S. 788, 795–796 (1986). Because LARA's (the state agency) decision that Afiouni relies on constitutes an unreviewed (in the sense that no state court has reviewed them) administrative finding, it does not preclude a subsequent Title VII action or defense, as is the case here. *Hillman v. Shelby Cnty. Gov't*, 297 F. App'x 450, 450 (6th Cir. 2008) (citing *Elliott*, 478 U.S. at 795–796)); *Smith*, 708 F.3d at 827-828; (ECF No. 57, PageID.1665 (citing ECF No. 57-2).)

Next, the Court determines whether an unemployment agency's administrative decision precludes a Michigan Elliott-Larsen Civil Rights Act (ELCRA) religious discrimination claim. "In interpreting state law, we apply the law of the state's highest court." *Herrera v. Churchill McGee, LLC*, 680 F.3d 539, 544 (6th Cir. 2012) (internal quotations

17

omitted). The Michigan Supreme Court has held that "MESC determinations are not to be used to collaterally estop the litigation of issues in a subsequent civil suit. Determinations made by the MESC are limited to the purpose of determining a claimant's eligibility for benefits."[9] *Storey v. Meijer, Inc.*, 429 N.W.2d 169, 174 (Mich. 1988); *see also Gaines v. FCA US LLC*, 522 F. Supp. 3d 295, 303–304 (E.D. Mich. 2021). "[T]he Employment Security Act was intended to provide relief from the hardship caused by involuntary unemployment" and should be "entitled to liberal interpretation to be [] compatible with [] legislative policy." *Storey*, 429 N.W.2d at 174. Additionally, the Act explicitly prohibits the use of information and determinations elicited during the course of an unemployment proceeding before any court or administrative tribunal, unless the unemployment agency is a party or complainant in the action. M.C.L. § 421.11 (West)(b)(1)(iii).

Here, Afiouni appealed the UIA decision denying her unemployment benefits to LARA, which is an administrative proceeding. (ECF No. 57-2, PageID.1685-1687.) Given that Michigan law prohibits

---

[9] The Michigan Employment Security Commission (MESC) is now known as the Unemployment Insurance Agency.

the use of unemployment information and determinations elicited in an unemployment proceeding in a subsequent civil proceeding, the Court finds that the facts or determinations made in Afiouni's unemployment case cannot preclude the discrimination issues. Thus, the Court denies Afiouni's collateral estoppel argument.

## B.    Discrimination Claims

The Court now turns to the merits.  Under Title VII, employers are prohibited from discriminating against employees and applicants on the basis of religion. 42 U.S.C. § 2000e–2(a). Afiouni brings a claim of religious discrimination under both Title VII and ELCRA. Discrimination claims brought under Title VII and ELCRA are evaluated under the same standards. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018).

The Supreme Court has recognized two distinct types of employment discrimination: disparate impact and disparate treatment. *EEOC v. Abercrombie & Fitch Stores*, Inc., 575 U.S. 768, 771 (2015). Disparate impact involves employment practices that are facially neutral in their treatment of different groups but treat one group more harshly

than another and cannot be justified by business necessity.[10] *Ricci v. DeStefano*, 557 U.S. 557, 577-578 (2009). Disparate treatment "occur[s] where an employer has treated [a] particular person less favorably than others because of a protected trait." *Id.* at 577 (internal quotations marks omitted). A disparate treatment plaintiff must establish that the "defendant had a discriminatory intent or motive for taking a job-related [adverse] action." *Id.* Under either circumstance, a plaintiff has the initial burden. *Alexander v. Loc. 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 405 (6th Cir. 1999). A plaintiff can establish a Title VII claim by producing "direct evidence of discrimination or circumstantial evidence which would support an inference of discrimination." *Birch v. Cuyahoga Cnty. Prob. Ct.*, 392 F.3d 151, 164 (6th Cir. 2004).

Afiouni brings a disparate treatment claim. ACCESS argues that Afiouni's claims should be dismissed because she cannot establish a prima facie case and has no direct evidence to support her religious

---

[10] The complaint alleges that ACCESS had a policy that allowed observant Muslims employees to take paid time off for Ramadan, but did not extend any similar paid time off to non-observant Muslim employees. (ECF No. 15, PageID.276.) As the Court noted in its motion to dismiss order, if this allegation is substantiated, such policy could violate Title VII. (*Id.*) However, because ACCESS did not seek summary judgment on the paid time off issue, the Court does not address it in its order. (*See* ECF No. 50 generally; *see also* ECF No. 50, PageID.688.)

federal and state discrimination claims related to: (1) failure to promote; (2) failure to receive a raise; and (3) termination. (ECF No. 50, PageID.703-705.) Afiouni contends that she has both direct and circumstantial evidence to establish her disparate treatment claims. (ECF No. 57, PageID.1669-1670, 1676.) The Court addresses her direct evidence first before considering her circumstantial evidence.

### 1.    Direct Evidence Analysis

The Court finds that Afiouni fails to present direct evidence of her promotion, raise, and termination claims. "Direct evidence is proof that, if believed, compels the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.*" Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013). Direct evidence is often viewed as a narrow concept. "Such evidence would take the form, for example, of an employer telling an employee, 'I fired you because you are disabled,'" *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir.1998), or "I did not promote you because of your Hispanic origin." *In re Rodriguez*, 487 F.3d 1001, 1012 (6th Cir. 2007) (Batchelder, J., concurring). "Once the plaintiff has produced credible direct evidence, the burden shifts to the employer to show that it would have taken the employment action of which the

plaintiff complains even in the absence of discrimination." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 238 (6th Cir. 2005).

Afiouni contends that several statements amount to direct evidence. (ECF No. 57, PageID.1669-1672.) She alleges that her employer criticized her for the way she dressed and that her supervisor and superiors made negative comments about her not observing Muslim holidays. (ECF No. 57, PageID.1671-1672 (citing ECF No. 57-4, PageID.1699-1706; ECF No. 57-5, PageID.1709, 1711-1717).) The Court reviewed and considered the exact pages of Afiouni's deposition testimony that she cited as her direct evidence. (*Id.*) Notably, Afiouni could not recall the exact comments made by her supervisors nor the dates for when the comments were made. At best, she recalled her supervisor Hadous, a Shia Muslim, "referencing…the colors I would be wearing, not black, or not practicing the mourning practice" and making comments that "we're supposed to be mourning this occasion, like at least show respect for the [Muslim] religion." (ECF No. 50-3, PageID.823.) Afiouni also testified that Hadous said "we should practice the religion," which Afiouni interpreted to mean that she should fast for Ramadan. (ECF No. 50-3, PageID.825-826.) Afiouni recalled Hourani-Harajli, a

22

Sunni Muslim, saying that she had a "preference" for Shi'ite Muslims, but she could not recall the context, the occasion, or when she made such statement.[11] (ECF No. 50-4, PageID.1125-1126.)

Afiouni also alleges that ACCESS employees spied on her and appears to assert that she was framed in order to be terminated because of her religion. She cites former ACCESS employee Chamesseddine's affidavit to support her allegation. Chamesseddine attested that she worked at ACCESS for nearly 5 years before resigning in September 2019 and that during her interview for the position, she was asked to "spy" on her supervisor, Afiouni, and to report Afiouni to upper management. (ECF No. 57-1, PageID.1681.) The Court notes that the affidavit does not identify who asked Chamesseddine to spy on Afiouni. Chamesseddine also avers that she believed Truccone eavesdropped on her and Afiouni during Chamesseddine's time there.

The Court finds that none of the comments Afiouni points to directly demonstrate that her religion as a non-observant, Sunni Muslim was a motivating factor inany ACCESS decision that could constitute an

---

[11] Hourani-Harajli's declaration does not mention whether she is an observant Muslim. (ECF No. 50-2, PageID.725.)

adverse action. *Hall v. Michigan State Police Dept*, 290 F. App'x 913, 917 (6th Cir. 2008) ("The problem with all of these statements is that they do not indicate that race was a motivating factor in the decision not to promote [plaintiff].") Each of the statements cited by Afiouni is ambiguous, vague, or requires one to make an inference that the statement is related to an adverse action. When evaluating direct evidence of a fact, the court cannot make an inference. *Rowan v. Lockheed Martin Energy Sys., Inc.,* 360 F.3d 544, 548 (6th Cir.2004) ("Direct evidence is evidence that proves the existence of a fact without requiring any inferences.") Additionally, none of the statements relate to the adverse actions complained of—failure to promote, lack of raise, and termination. There also is a proximity issue. Comments made five months before an adverse action are too isolated or remote in time to constitute direct evidence. *See Hein v. All Am. Plywood Co., Inc.*, 232 F.3d 482, 489 (6th Cir.2000). Afiouni fails to specify when the comments were made.

Even considering Chamesseddine's affidavit which suggests that she was asked to spy on Afiouni, this comment was made in 2014, at the latest, and is too remote in time to relate to the alleged adverse actions

24

and fall within the statute of limitations. (ECF No. 57-1, PageID.1681.) The affidavit does not explain why she was asked to surveil Afiouni. Chamesseddine's statements also failed to show that ACCESS had a religious bias against Afiouni or that she was being treated differently because of her non-observant, Sunni Muslim status. *Id.* These statements do not even mention Afiouni's protected status. *Id.* At best, Chamesseddine's statements suggest that ACCESSS "had a toxic environment," which included working with "harassing" clients, and also that her co-workers, such as Truccone, "did not like 'Mrs. Afiouni for no reason[.]'" *Id.* Neither allegation constitutes direct evidence of a religious discrimination claim. *Peeples v. City of Detroit*, 891 F.3d 622, 633 (6th Cir. 2018) (Direct evidence requires "discriminatory intent" or "discriminatory motive by the [employer]."); *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003) ("Comments made by individuals who are not involved in the decision-making process regarding the plaintiff's employment do not constitute direct evidence of discrimination.").

The Court acknowledges that Hadous' fasting and clothing remarks made annually may be inappropriate for the workplace, but it finds that they do not amount to direct evidence. In order for such comments to

equate to direct evidence, there must be an indication that Afiouni's non-observant, Sunni Muslim status was "a motivating factor" in ACCESS's decisions. *Hall*, 290 F. App'x at 917.  Additionally, Afiouni failed to argue and offer evidence that Sunni Muslim Hourani-Harajli, who she alleges had a preference for Shia Muslims, had any role in the decision-making process for the alleged adverse actions Afiouni suffered. *See also Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 433 (6th Cir.2002) (holding that a company manager's opinion that "'race was a factor' in the company's decision to deny [the plaintiff] the promotions for which he applied," did not constitute direct evidence for purposes of the plaintiff's discrimination claim because the manager had "no involvement in the decision-making process with respect to the particular jobs at issue.") Thus, the Court finds that Afiouni fails to introduce direct evidence of discrimination. The Court now considers her claim under the circumstantial evidence framework.

### 2.    Circumstantial Evidence Analysis

"Title VII claims based on circumstantial evidence of discrimination are analyzed under the familiar three-step framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct.

1817, 36 L.Ed.2d 668 (1973)." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021). "[O]n a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Id.* "Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of establishing his or her prima facie case by demonstrating that:

> (1) she was a member of a protected class;
>
> (2) she suffered an adverse employment action;
>
> (3) she was qualified for the position; and
>
> (4) she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees.

*Id.* at 508. "The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions, supported by admissible evidence that 'if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.'" *Id.* "Finally, the employee has the burden of proving by a preponderance of the evidence that the employer's proffered reasons were a mere pretext for discrimination." *Id.* at 505-509.

### a. Failure to Promote

Afiouni alleges that ACCESS discriminated against her by failing to promote her to another position because of her religion (ECF No. 1, PageID.4-7), which violates Title VII. *See, e.g.*, *Bolden v. Lowes Home Centers, LLC*, 783 F. App'x 589, 594 (6th Cir. 2019) (citing *White*, 429 F.3d at 240).

Afiouni contends that she can prove her claim with circumstantial evidence. (ECF No. 57, PageID.1674-1675.) To establish a failure to promote claim, Afiouni must demonstrate that:  (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied. *White*, 429 F.3d at 240.

ACCESS only disputes the second and fourth elements. (ECF No. 50, PageID.704.) To be considered for promotion at ACCESS, current employees are required to apply to a different position.[12] (ECF No. 50-3,

---

[12] Afiouni did not allege in her complaint that vacant opportunities were unknown to her. Had she done so, she could have fallen within the Sixth Circuit's exception to the second element which allows plaintiffs to not have to establish that they applied for

PageID.874; ECF No. 50-4, PageID.1122; ECF No. 50-5, PageID.1374.) As to the second element, ACCESS disputes the number of promotions that Afiouni applied for and contends that she only applied to one promotion because that is all she could recall. (ECF No. 50, PageID.704.) Afiouni asserts that she applied for and was qualified for "promotions."[13] (ECF No. 57, PageID.1674-1676.)

The only evidence Afiouni cites to support her claim is her deposition testimony where she stated, "I was qualified for so many positions that I wasn't given a chance for." (ECF No. 57-5, PageID.1708; ECF No. 50-4, PageID.1119.) To satisfy the second element, a plaintiff must be qualified and also have applied to the position or expressed a specific interest in a position. Expressing a generalized interest in a position is generally insufficient. *See Bolden*, 783 F. App'x 589, 594–95 (citing *Wanger v. G.A. Gray Co.*, 872 F.2d 142, 146 (6th Cir. 1989)).

A plaintiff who fails to apply for a position can establish a failure to promote claim by providing evidence that an "employer's history of gross

---

and were qualified for the position if the vacant position was not known to employees. *See Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1022 (6th Cir. 2000).

[13] Neither party identifies the names of positions, the job description, nor the salaries for the positions Afiouni applied to or was considered for.

and pervasive discrimination creates an atmosphere of futility." *Russell v. Three Pillars*, No. 21-1481, 2022 WL 351770, at \*5 (6th Cir. Feb. 7, 2022) (citing *Wanger v. G.A. Gray Co.*, 872 F.2d 142, 145–46 (6th Cir. 1989)) (internal quotations omitted). For this futility exception to apply, the plaintiff must provide evidence that applying to the position at issue would be a futile measure. *Id.* (citing *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 337–338 (1977) and stating, "the plaintiff established gross and pervasive discrimination using statistical evidence and the testimony of individuals who recounted over 40 specific instances of discrimination.")

Regarding the second element, Afiouni does not cite any evidence establishing that she applied for multiple promotions and was denied.[14] While Afiouni argues that "[s]he was constantly criticized and subject to hostility," and appears to suggest that applying to posted positions would have been meaningless, she does not offer any statistical evidence or testimony from herself or other individuals recounting the number of

---

[14] The Court notes it has "has "no duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Parsons v. FedEx Corp.*, 360 F. App'x 642, 646 (6th Cir. 2010).

"specific instances of discrimination" to qualify for the futility exception. (ECF No. 57, PageID. 1672, 1675.)

As a result, the Court reviewed Afiouni's deposition testimony regarding her applications for promotions. The Court found that when asked whether she submitted any applications for a promotion, Afiouni testified, "I did try one time at least," sometime after "2017." (ECF No. 50-3, PageID.875-876; *see also* ECF No. 50-4, PageID.1123.) The Court finds that the record establishes, and there is no dispute, that Afiouni only applied for one promotion and grants summary judgment as to all other alleged promotions. *Hall v.* 290 F. App'x at 918 ("This failure to apply means that Hall was unable to establish the second element of his prima facie case.")

Regarding the fourth element for this single failed promotion, ACCESS argues that Afiouni presents no evidence that the person hired for the role has similar, better, or worse qualifications than her. (ECF No. 50, PageID.704.) In her response, Afiouni does not offer any evidence or explanation about her qualifications, nor the qualifications or identity of the person ultimately hired. (ECF No. 57, PageID.1676.) Instead, Afiouni makes blanket assertions that she "trained her boss who had no

31

qualifications" and that "others of lesser qualifications got promotions and raises while she was denied." (ECF No. 57, PageID.1676.)

The Court find these conclusory allegations insufficient to meet her burden on summary judgment. "[I]n order to satisfy the fourth prong of the *prima facie* burden in a failure to promote case, it is incumbent upon the plaintiff to establish that she and the non-protected person who ultimately was hired for the desired position had similar qualifications." *White*, 429 F.3d at 242. Afiouni has not presented any evidence from the record, nor even discussed, the name of the person hired, either of their qualifications, or the religious identity of the person hired for the role for which Afiouni applied and was interviewed. Afiouni's prima facie case therefore fails because she does not identify a similarly situated employee who was not a Sunni Muslim and who was promoted to the one position she applied for. *See Hightower-Mathis v. Nextcare Michigan Providers, PLLC,* No. 25-1623, 2026 WL 126494, at *5 (6th Cir. Jan. 16, 2026) (affirming summary judgment and finding that a plaintiff could not establish a prima facie case where she offered conclusory allegations about her comparators and could not provide the names, the job position, or other specific details.) Having failed to introduce such evidence, the

Court finds Afiouni cannot satisfy the fourth prong of the prima facie case related to her failure to promote claim.

For these reasons, the Court **GRANTS** ACCESS's motion for summary judgment as to Afiouni's failure to promote claim.

### b. Failure to Pay Raise

As to Afiouni's claim based on ACCESS's alleged failure to pay her a raise, the Court finds that Afiouni cannot establish the claim using circumstantial evidence. ACCESS only disputes the fourth element of establishing a prima facie case—arguing that Afiouni was not treated differently than similarly situated, non-protected employees. (ECF No. 50, PageID.704-705.)

Afiouni's response fails to address the prima facie elements for bringing a failure to pay a raise claim under Title VII. Instead, she reiterates a number of allegations. Afiouni alleges that her salary never rose above $49,000, even though she worked for ACCESS for over 19 years and was more qualified than other employees. (ECF No. 57, PageID. 1674-1675,1678.) She contends that she testified "repeatedly about other parties who received more pay and higher, more frequent pay raises than her." ECF No. 57, PageID. 1674-1675. The Court notes that

Afiouni did not identify the names of her comparators in her brief or the years the alleged pay disparities took place, nor did she support her allegations with any citations to the record to establish she was paid less than similarly situated employees outside of her protected class, i.e., non-observant, Sunni Muslim.

In order to satisfy the fourth element, a plaintiff must show that they and the employees outside of their protected class are "similar in all of the *relevant* aspects." *Hatchett v. Health Care & Ret. Corp. of Am.*, 186 F. App'x 543, 548 (6th Cir. 2006) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*,154 F.3d 344, 352 (6th Cir.1998)) (emphasis in original). Courts consider "[d]ifferences in job title, responsibilities, experience, and work record … to determine whether two employees are similarly situated." *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004).

The Court reviewed and considered Afiouni's deposition testimony. Afiouni testified that ACCESS gave other "supervisors or coordinators" raises. (ECF No. 50-3, PageID.870.) When asked to identify the supervisors who received raises, she only recalled Koprencka and Amin. (ECF No. 50-3, PageID.872-874.)  The Court finds that Koprencka is not a valid comparator because she, like Afiouni, is a non-observant, Sunni

Muslim. (ECF No. 50-8, PageID.1537.) As to Amin, an observant Shi'ite Muslim, Afiouni testified that Amin told Afiouni that he received more raises than she did. (ECF No. 50-3, PageID.867, 872, 942.) She alleges that Amin said, "It's not about what I know; it's about who I know," and that he had upper management "in his pocket." (No. 50-3, PageID.943.)

Amin worked as a PATH supervisor. (ECF No. 50-3, PageID.867, 950.) When asked whether Amin would be considered "roughly a peer," of hers, Afiouni testified, "He had, in a way -- what I was told by Najwa [Hadous] at that time, because of his program and the way they received funding for the PATH, which is higher money and higher capacity, that his authority would be different than mine." (ECF No. 50-3, PageID.949-950.) While the Court is unable to ascertain all of the differences in Amin and Afiouni's background and qualifications, based on Afiouni's own testimony that Amin had more authority and ran a larger program with greater expenditures than she did, the Court finds that he is not a similarly situated comparator. *See also Hatchett*, 186 F. App'x at 548 (comparing a plaintiff's duties to her comparator's responsibilities and concluding that the two employees were not similarly situated). The Court also notes that despite her allegations that she did not receive a

35

raise often, Afiouni testified that she received a $5,000 raise in May 2020. (ECF No. 50-5, PageID.1374; ECF No. 50-3, PageID.933.)

Thus, she cannot establish a prima facie case based on her failure to substantiate the fourth element. For these reasons, the Court **GRANTS** ACCESS's motion for summary judgment as to Afiouni's failure to pay a raise claim.

### c. Termination

Finally, ACCESS moves for summary judgment on Afiouni's claim that it terminated her for religious beliefs and non-religious observance. The only element of a prima facie case that appears to be in dispute is whether ACCESS replaced Afiouni by someone outside of her protected class or treated Afiouni less favorably than a similarly situated employee. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016). ACCESS contends that Afiouni presents no evidence to support the fourth element because: (1) ACCESS replaced Afiouni with Koprencka, who shares her protected class, specifically a non-observant, Sunni Muslim (ECF No. 50-8, PageID.1533, 1537); and (2) the only similarly situated employee, Truccone (a Catholic), received the same discipline —

36

termination. (ECF No. 50, PageID.705, 707; ECF No. 50-5, PageID.1380; ECF No. 50-9, PageID.1555.)

The Court finds Afiouni's brief is devoid of any evidence to support the similarly situated element. When addressing her termination claim, Afiouni first reiterates that ACCESS is estopped from claiming that she was terminated for cause. As discussed above, collateral estoppel does not apply here. Afiouni then argues that she "was despised" for "betraying what was expected of her" as a Muslim, terminated for no legitimate reason after over nineteen (19) years," and "was treated far less favorably than those at ACCESS outside her protected class." (ECF No. 57, PageID.1676-1677.) Again, at the summary judgment stage, plaintiff must do more than make allegations. To defeat summary judgment Afiouni must point to the record to support her claims. Afiouni fails to produce any evidence to create an issue of fact. *See Hightower-Mathis,* No. 25-1623, 2026 WL 126494, at *5 (stating that conclusory allegations and speculations are not sufficient to defeat a well-supported motion for summary judgment and finding that a plaintiff cannot establish a prima facie case at the summary judgment stage without factual evidence of a comparator). She does not identify any similarly

situated individuals to support her prima facie burden. The record establishes that ACCESS hired Koprencka, who shares Afiouni's non-observant, Sunni Muslim protected status, to fill Afiouni's former position. (ECF No. 50-8, PageID.1537.) Additionally, ACCESS disciplined another employee outside of her protected class the same way it disciplined Afiouni— it terminated Truccone, a Catholic, for the same conduct Afiouni engaged in. (ECF No. 50-9, PageID.1555.) As a result, the Court finds that Afiouni cannot establish a prima facie case.

Thus, the Court must **GRANT** summary judgment on Afiouni's religious discrimination claim based on her termination.

### C.    Request for Sanctions

In its motion for summary judgment, ACCESS requests that the Court impose sanctions on Afiouni for filing a fictitious complaint. (ECF No. 50, PageID.675.) ACCESS neither addresses the standard for sanctions nor proffers an argument in its brief for why such action is appropriate. (ECF No. 50, PageID.687.) Given the lack of discussion, the Court finds the argument abandoned. Therefore, the Court **DENIES** ACCESS's request for sanctions.

### V.    CONCLUSION

Accordingly, **IT IS ORDERED** that ACCESS's motion for summary judgment regarding the religious discrimination claims based on failure to promote, failure to pay a raise, and termination (ECF No. 50) is **GRANTED** and only Afiouni's claim about discriminatory paid time off benefits remains.

**IT IS FURTHER ORDERED** that ACCESS's request for sanctions is **DENIED.** (ECF No. 50.)

**SO ORDERED.**

Dated: March 31, 2026                **s/Jonathan J.C. Grey**
                                                       Jonathan J.C. Grey
                                                       United States District Judge

## Certificate of Service

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 31, 2026.

<u>s/ S. Osorio</u>
Sandra Osorio
Case Manager